IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| BORGWARNER TURBO SYSTEMS, LLC, a Delaware LLC,<br>Plaintiff | ) ) ) ) | Docket No. 1:24-cv-00188-MR-WCM |
| v. | ) ) ) | **BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| MODERN INDUSTRIES, INC.,<br>a Pennsylvania corporation<br>Defendant | ) ) ) | |

## INTRODUCTION

BorgWarner ("BW") wants to hijack Modern Industries' production lines for parts Modern has never agreed to produce. That extraordinary demand is based on a thin reed of evidence—merely BW's own blanket purchase orders ("POs") and one-sided terms and conditions. But BW ignores the lengthy commercial history for these parts and the parties' course of dealing—namely, Modern's own Quotations and Standard Conditions that conflict with BW's proposed terms in key respects (e.g., price, duration, acceptance, etc.). Under applicable law, BW's alleged "Supply Contracts" are not binding on Modern as long-term, enforceable requirements contracts, and thus BW cannot satisfy its high burden for the "extraordinary" and "disfavored" relief it seeks. The remaining requirements for an injunction favor Modern: on irreparable harm, BW's alleged harm is "remote and speculative" and not "actual and imminent" because not only has BW itself waited months, if

1

not longer, to address this issue, but also BW's alleged harm can be remedied with money damages; on the balance of harms, Modern would face its own substantial harm if it is forced to divert production resources away from current critical customers to BW; and on the public interest, the disruptions of supply chains of Modern's customers and difficulties of judicial administration favor denial.

Put simply, BW cannot succeed on the merits and its alleged "emergency" is no emergency at all, as evidenced by its own delay. Accordingly, BW is not entitled to the extraordinary, overbroad, and disfavored injunction it seeks.

## BACKGROUND[1]

### A.   Modern and BW's contractual relationship

Modern, a small family-owned business in Erie, Pennsylvania, has sold dozens of parts—namely turbocharger components and related items—to BW for over two decades. RM Decl. ¶¶ 4, 7. Nine of those parts are at issue here, and even more are at issue in the related companion case pending in the WDPA, *infra* p. 9.

The commercial history for each of the parts—including the nine parts at issue here (the "Parts")—is complex and factually intensive. RM Decl. ¶ 14. BW admits that "each part is governed by a separate contract[,]" (Dkt. 22, p.4), but the parties' history shows contracts formed individually on a release-by-release basis by conduct and exchanging various documents. As a general matter, for each part, Modern and BW's course of dealing would include the following steps:

---

[1] A more detailed factual background is contained in the attached Marcoline Declaration.

- BW expresses interest in purchasing specific parts from Modern, either through direct inquiry or by issuing a PO for a given part (which purports to incorporate, but does not separately provide, BW's standard terms and conditions). The PO—like those at issue here—does not identify a quantity and often has an end date of "12/31/9999".

- Modern provides a quotation which indicates Modern's price for the part, any minimum order quantities ("MOQ"), and other key terms. Modern's "quotation is subject to" its own "Standard Conditions of Sale" which are sent along with the quotation. This quotation sometimes is provided before BW provides a PO.

- Modern does not accept or acknowledge BW's PO or terms and conditions in writing.

- BW issues releases, which constitute the actual orders for parts and include the quantity and ship date, along with other key information.

- The price for the released parts is previously communicated between the parties through POs, Quotations, and other methods.

- If Modern disagrees with the release or other terms, Modern notifies BW of the discrepancy, in which case BW may update its price and quantity. Those circumstances vary for each part and each release.

- Once Modern and BW are aligned on the terms—price, quantity, etc.—for a given release, Modern processes the order and ships the requested quantity.

- If Modern and BW are not aligned on the terms for given releases, Modern will not accept or ship against the releases.

RM Decl. ¶ 15. Scores of documents reflect this history: quotations, terms and conditions, releases, POs, forecasts, invoices, and emails, among others. *Id*. ¶ 16.

**B.    General commercial history for specific parts at issue in BW's Motion**

For the Parts, Modern and BW followed their standard practice set forth above. RM Decl. ¶ 17. This commercial history and course of dealing contradicts BW's contention that its POs and terms constitute the full, binding agreement be-

tween the parties. *Id.* ¶ 18. BW would not always issue its PO before Modern would ship ordered quantities. *Id.* ¶ 19. Modern never agreed to or accepted in writing BW's POs or terms and conditions for the Parts. *Id.* ¶ 20

The commercial history for Part 175817 serves as an illustrative example of the true—and complex—nature of the commercial dealings between the parties. RM Decl. ¶ 29. For Part 175817, Modern regularly provided BW with quotations dating back to December 17, 2008, and on at least three other occasions: April 2017, April 2021, and February 2023. *Id.* ¶ 30; Ex. C. Following its standard practice, Modern issued its quotations, with its Standard Conditions. RM Decl. ¶¶ 11-13. 21. The Quotation indicates Modern's price, MOQ, and other key terms. *Id.* The Quotation says that Modern "submit[s] the following quotation for your consideration," that "[t]his quotation is subject to standard conditions of sale included in the quote." Modern's Conditions, as provided to BW, included these terms:

- ACCEPTANCE – All orders are subject to acceptance by Modern Industries, Inc.

- BLANKET ORDERS – Blanket orders must contain firm releases for total quantity involved on order. Blanket orders may be effective for a maximum of one year . . .

- QUANTITY FACTOR – It is difficult to predict accurately the quantity of parts that will be lost in processing. Prices are based on the option to ship over or under by ten percent of the quantity ordered unless otherwise stated.

- MATERIAL AND PROCESSING PRICES – Quoted prices are based on current material and other processing purchase

4

costs. Quote may be changed to reflect changes in our purchase costs at time of order acceptance.

In response, BW issues releases, matching some or all of the quantity, price, and shipping terms on Modern's quotations.  RM Decl. ¶ 22.

For the Parts, the prices regularly changed without written agreement. RM Decl. ¶ 23. Instead, the price changes occurred after Modern issued an updated quotation and BW issued a release with the matching price, consistent with standard industry practice and the parties' course of dealing. *Id*. Modern's practice for has consistently been to not accept releases or ship parts with prices or quantities that did not match its quotations. *Id.* ¶ 24-25.  BW's practice, until 2023, was to update its releases with Modern's prices, recognizing that parts would not be shipped until releases were updated and accepted by Modern.  *Id.* ¶ 26.  Indeed, for Part 175817, BW's POs show five different price increases on a periodic basis. Dkt. 1-1 at 11. Modern's records for Part 175817 show even more: 15 different prices from December 2008 until February 2023. RM Decl. ¶ 28. Those changes occurred without written agreements and within the parties' course of dealing.

BW claims to have at some point issued a blanket shipping order for Part 175817 that is labeled a "scheduling agreement" and that BW refers to as the governing "Purchase Order" (the "175817 Blanket PO"). *Id.* ¶ 31. But Modern never accepted the 175817 Blanket PO, in writing or otherwise. *Id.* ¶ 34. The 175817 Blanket PO irreconcilably conflicts with the parties' course of dealing and Mod-

5

ern's Quotation and Standard Conditions for that part. *See* Ex. C. Critically, consistent with the parties' course of dealing and Modern's Conditions, (a) any orders "are subject to acceptance by Modern Industries, Inc." and (b) any "blanket orders" must contain "firm releases" and may "effective for a maximum of one year." *Id.* ¶¶ 31-32. After BW issued the 175817 Blanket PO, it issued individual releases; when these aligned with Modern's quoted price, quantity, and terms, Modern shipped the goods—consistent with the parties' course of dealing and its Standard Conditions (e.g., the releases were "firm releases," with a quantity, and effective for less than a year). *Id.* at ¶¶ 35-36. The commercial history for the remaining Parts is similar, with Modern regularly providing quotations and abiding by releases that complied with those quotations and its Standard Conditions. *Id.* ¶¶ 43-50.

In February 2023, Modern again issued an updated Quotation for Part 175817, in part due to increases in Grede's casting costs. *Id.* ¶ 37. BW requires that all castings for these Parts be supplied by Grede, at Grede's terms. *Id.* ¶ 52. Grede—like many businesses—has frequently increased its prices. *Id.* ¶ 53. As Modern understands it, BW directly negotiates and agrees to these casting prices increases with Grede. *Id.* ¶ 55. Like all prior Quotations, it included price, MOQ, and Modern's Standard Conditions. *Id.* ¶ 38. After this updated Quotation, Modern refused BW's releases that issued under outdated prices. *Id.* ¶¶ 39-41.

6

**C.      The Parties have not agreed on these terms for over a year and a half.**

Since February 20, 2023, Modern has not accepted any releases inconsistent with its Quotation and Standard Conditions—including for Part 175817.[2] *Id.* ¶¶ 57-58. The parties negotiated for months. *Id.* ¶¶ 60-61. In March of 2024, Modern re-iterated its position and repeated it over the following months.  *Id.* ¶ 62. Then, just a couple weeks before the parties were set to mediate the related WDPA Action, BW sent Modern a demand letter regarding these parts, followed by a proposed "spot buy PO" at Modern's price. *Id.* ¶ 63. Modern asked BW the exact number of parts it needed (120), which was within the inventory Modern had on hand, and thus Modern agreed to ship its full inventory.  *Id.* ¶ 64. Since then, Modern has nei-ther produced more of these parts nor accepted any releases.  The same is generally true for the remaining parts at issue, as Modern last issued quotations over two years ago for some parts. *Id.* ¶ 67. Despite these ongoing disagreements, BW sat on its hands, apparently not pursuing an alternative supplier or otherwise seeking resolution of this so-called "emergency."[3] *Id.* ¶ 68.

**D.      Modern faces substantial harm if it is required to shift its production lines from Modern's other customers to BW for the parts at issue.**

BW is not Modern's only customer; far from it. Modern provides a variety

---

[2] Modern has accepted two individual "spot buy POs" over the last year and a half, but those were at Modern's price and outside of the normal procedure for releases in any event.

[3] As BW knows, it will take Modern several weeks, if not longer, to manufacture and ship the parts. Modern must order castings from Grede, wait for Grede to ship, and then manufacture and assemble the full part once all components arrive. *Id.* ¶ 66.

of manufacturing related services for a diverse market of customers: United States military/defense contractors, aerospace companies, and health care providers. *Id.* ¶¶ 74-75. Modern strives to schedule its production lines to maximize production levels and ensure that all customers are served timely and consistent with their required shipping timelines. *Id.* ¶ 76. Modern's production equipment and its skilled labor and management personnel—and specifically those used to manufacture the parts at issue here—are currently optimized and engaged in the processing of other customer's purchase order and release agreements. *Id.* ¶ 77. Those resources are currently used, or scheduled to be used in the coming weeks and months, for existing customers, including military and defense industry customers. *Id.* ¶ 78.

If Modern is forced to interrupt its current production lines for BW, Modern likely will incur significant reputational harm from cancelling orders and costs associated with such a changeover: retooling, set-up and other transitional costs, possible labor stoppages and layoffs. *Id.* ¶ 79. The harm would extend to Modern's customers—most critically its defense industry customers—whose supply chains could grind to a halt. *Id.* ¶ 80. Modern's customers could also be forced to send workers home, reduce hours, or even institute lay-offs at impacted facilities. *Id.* ¶ 81. Modern would also suffer irreparable harm to its goodwill and reputation that it has cultivated over years with its customers and in general. *Id.* ¶ 82. Furthermore, critical defense industry parts that have been purchased for ultimate use by the U.S.

government will not be produced either in turn causing further ripple effects to the defense industry, U.S. military endeavors, and the public generally. *Id.* ¶ 83.

## E.   Recent litigation history

In November of 2023, after several months of BW refusing to issue releases consistent with Modern's quotations, BW filed a similar suit against Modern in this court. Case No. 1:23-cv-00344, Dkt. No. 1. BW also filed a motion seeking a TRO and preliminary injunction. *See id.*, Dkt. No. 3 and 4.  Meanwhile, BW issued "spot buy POs" for the parts at issue at prices and quantities consistent with Modern's quotations.  At the time, unlike now, Modern had some parts and the components in inventory. (Modern also did not face the irreparable harm it faces now, *see supra* p. 7-9; RM Decl. ¶¶ 74-83.) Modern thus accepted the November 2023 spot buy POs, and only the spot buy POs, and shipped the requested parts.  BW then withdrew its pending motions and voluntarily dismissed the case. *Id.*, Dkt. 9, 13.[4]

Meanwhile, other related, parallel litigation between the parties was percolating arising out of BW's breach of its contractual obligations. On February 23, 2024, Modern filed a Complaint against BW in Erie County, Pennsylvania. *See* Complaint (the "WDPA Action"). BW then removed the case to federal court where the case remains pending. *See Modern Industries, Inc. v. BorgWarner Turbo Systems, LLC*, Case No. 1:24-cv-00083-SPB (W.D. Pa.). That case is in the middle

---

[4] Voluntary dismissal under rule 41(a)(1) "operates to leave the parties as if no action had been brought at all." *In re Matthews*, 395 F.3d 477, 480 (4th Cir. 2005).

of discovery and involves the same parties, witnesses, lawyers, and core issues. As a result, Modern has filed a motion to transfer venue to the WDPA for consolidation with that previously filed matter.  *See* Dkt. 18.

### ARGUMENT

BW has not met its burden as to any of the required four factors.

**A.     BW Seeks a "Disfavored" Mandatory Injunction and Cannot Meet the Heightened Burden for that "Extraordinary" Relief.**

BW seeks a mandatory preliminary injunction—because it forces Modern to take specific action—and thus faces a heightened burden. A mandatory injunction is "a particularly aggressive form of preliminary injunction" that is "disfavored" in "any circumstance" and "warranted only in the most extraordinary circumstances." *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). Detailed mandatory injunctions are reserved for "extreme cases"; "they are last resorts, not first." *Action NC v. Strach*, 216 F. Supp. 3d 597 (M.D.N.C. 2016).

Whereas mandatory injunctions alter the status quo, prohibitory injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *League of Women Voters of N.C. v. N.C.*, 769 F.3d 224, 236 (4th Cir. 2014). Here, BW seeks to dramatically alter the status quo—not preserve it—by forcing Modern to ship products against releases it has not accepted since February of 2023. The status quo for the last year and a half has been Modern and BW not agreeing on key terms and BW not shipping parts.  BW's requested relief "goes

10

beyond the status quo and forces [Modern] to act," and is thus a mandatory injunction. *Mercedes-Benz U.S. Int'l, Inc. v. Cobasys, LLC*, 605 F. Supp. 2d 1189, 1196 (N.D. Ala. 2009). Other courts addressing the same question (including in the automotive industry) agree and thus require a heightened burden for relief. *See Mercedes-Benz*, 605 F. Supp. 2d at 1196; *see also Zurn Constructors, Inc. v. B.F. Goodrich Co.*, 685 F. Supp. 1172, 1180 (D. Kan. 1988). Indeed, "[a]n injunction that would force a party's continued participation in a business venture and require ongoing cooperation with a litigation opponent is a disfavored, mandatory injunction that would 'undoubtedly' require ongoing court supervision." *Phibro Biodigester, LLC v. Murphy-Brown, LLC*, 2022 WL 17243727, at *4 (D. Utah Nov. 23, 2022). What's more, "[g]ranting the ultimate relief requested, even temporarily, at an early point in the case, often prior to the issues even being joined in the pleadings, seems rightly reserved for only the most compelling of cases." *Dewhurst v. Century Aluminum Co.*, 731 F. Supp. 2d 506, 514 (S.D. W. Va. 2010), *aff'd*, 649 F.3d 287 (4th Cir. 2011). Granting BW's Motion would require declaring that there are enforceable, long-term requirements contracts for the Parts—the exact ultimate relief BW seeks—and thus, that relief is particularly inappropriate here.

**B.    BW's Right to Relief is Neither Clear Nor Likely[5]**

**1.  BW has not provided even minimal details supporting its claims.**

The crux of BW's case is that Modern breached the alleged Supply Con-

---

[5] Modern cites law from PA, NC, and MI due to the choice of law issues discussed *infra* B.5.

tracts because it apparently "stopped shipping ordered Parts" and "missed sched-uled deliveries." Br. 14. But BW provides no other details to support this alleged breach: Which orders? How were the orders placed? By releases? When? For how many parts? The Complaint states only conclusory allegations of breaches and therefore fails to state a claim, as set forth in Modern's forthcoming motion to dismiss. To be sure, Modern has not shipped against releases not in compliance with its quotations and the course of dealing. But to meet its burden on success on the merits, BW must provide more in the way of actual evidence. This evidence is necessary given the extraordinary relief sought and the complex commercial histo-ry. Without it, the Court cannot assess whether any "orders[]" or "scheduled de-liveries" are binding; it must know when they were issued, whether they were ac-cepted, and what communications between the parties preceded said orders.

### 2. Modern is not bound to a long-term requirements contract.

Regardless of any factual deficiencies in its claims, BW cannot succeed on the merits for a fundamental reason: its alleged one-sided "Supply Contracts" are not binding because there has been no "meeting of the minds." Modern never ac-cepted the "Supply Contracts," instead providing its own governing Quotations and Standard Conditions. *See, e.g.,* Ex. C.

A contract is only binding if there is a "meeting of the minds." *See Brisbin v. Superior Valve Co.,* 398 F.3d 279, 293 (3d Cir. 2005). BW's alleged "Supply Con-

tracts" do not meet that threshold requirement. First, Modern never accepted these proposed contracts in writing. The parties never negotiated, drafted, or executed an overarching agreement governing the supply of parts. The "Supply Contracts" are merely BW's proposed terms. This is a clear violation of the statute of frauds, which requires a "contract" "signed by the party against whom enforcement is sought." *See* 13 Pa.C.S.A. § 2201(a); MCL § 440.2201.[6]

Second, Modern repeatedly countered with its own Quotations and Standard Terms—in other words, a classic "battle of the forms."[7]  Modern repeatedly provided—both before and after BW's POs—its own quotations, subject to its own Standard Conditions. BW's proposed terms conflicted in key respects:  e.g., price, minimum order quantities, acceptance, duration, etc. RM Decl. ¶¶ 15-25; Ex. C. This prototypical "battle of the forms" situation results in the conflicting terms *not* binding the parties. Under the UCC and its "knock-out" rule, a party's proposed "additional" or "different" terms do not become part of the contract if any of the following are satisfied: (a) the initial "offer expressly limits acceptance to terms of the offer[,]" (b) they "materially alter it," and (c) "notification of objection" is given. UCC § 2207. Each of these provisions apply here, as both parties (a) limited acceptance to their terms, (b) proposed different material terms, including price,

---

[6] The statute of frauds' writing requirement applies to "requirements contracts," so BW cannot argue it does not. *E. Dental Corp. v. Isaac Masel Co.*, 502 F. Supp. 1354, 1363 (E.D. Pa. 1980).
[7] The UCC provisions of MI, PA, and NC on the "battle of the forms" are the same. *See* MCL § 440.2207; 13 Pa.C.S.A. § 2207; N.C. Gen. Stat. Ann. § 25-2-207.

duration, quantity, and acceptance, and (c) notified each other of objections through their different proposals. As a result, none of the conflicting terms are binding. *See Insteel Wire Prod. Co. v. Dywidag Sys. Int'l USA, Inc.*, 2009 WL 2253198, at \*2 (M.D.N.C. July 28, 2009) (citing § 25-2-207); *see also, e.g., Key Safety Systems, Inc. v. Invista, S.A.R.L., L.L.C.*, 2008 WL 4279358, at \*7 (E.D. Mich. Sept. 16, 2008). The result is the same regardless of the order in which the documents were exchanged, *see Insteel*, 2009 WL 2253198 at \*2, though Modern provided its Quotations and Standard Conditions (importantly, for Part 175817) both before and after receipt of any BW PO. RM Decl. ¶¶ 26-35.

Without agreement on terms and conditions, the parties have only a "contract by conduct" on BW's individual releases that Modern accepted and shipped against.[8]  In other words, the parties' had a standard commercial arrangement with individual orders.[9]  Here, BW has not alleged any breach arising out of any releases Modern accepted, and thus BW has not met its high burden.

BW also ignores the parties' negotiation history. Instead, in barely a page of

---

[8] In a contract by conduct, "the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act." 13 Pa.C.S. § 2207(c). To determine the other terms of the contract, courts look to course of performance, course of dealing, and usage of trade. *See* 13 Pa.C.S.A. § 1303. If no implied agreement exists for a term, the UCC gap fillers provide for price term, delivery in single or several lots, place of delivery, time for shipment or delivery, time for payment, assortment of goods, specifications relating to shipment, mercantile terms, and risk of loss. *See* Article 2 gap fillers, 1 UCC Trans Gd § 5:10.

[9] The parties' course of performance also resembles a "release-by-release contract." *See MSSC,* 999 N.W.2d at 338 (Mich. 2023), *as amended* (Sept. 22, 2023).

briefing, BW attempts a silver-bullet argument—that performance alone forms a binding contract as to the Supply Contracts *only*, notwithstanding any other proposed terms. This argument is flawed, as explained above. Performance of individual releases binds Modern only to those releases, not in perpetuity to a one-sided, illusory requirements contracts. Indeed, BW cites no case law for this proposition and instead cites only an inapplicable provision of the UCC (Section 2206 does not apply in light of Sections 2201 and 2207, as discussed above).[10]

### 3. BW's "Supply Contracts" are also not valid requirements contracts.

Even if BW could establish acceptance and a meeting of the minds, BW's alleged "Supply Contracts" are not valid requirements contracts. A requirements contract fails for lack of consideration if "it does not obligate Plaintiff to buy its good-faith requirements from Defendant." *Eberspaecher N. Am., Inc. v. Nelson Glob. Prod., Inc.*, 2012 WL 4356781 at *6-7, (E.D. Mich. Sept. 23, 2012); *see also* 13 Pa. C.S. § 2306 (requiring the purchase of "output or requirements as may occur in good faith"). Although containing the "requirements" label,[11] the alleged Supply

---

[10] In BW's brief the first time it attempted an injunction, it cited a case for the proposition that "'[i]n the automotive industry and under Michigan law' a purchase order becomes binding on the seller once 'shipment orders are issued against them'". *See* Brief at 12 (citing *Sundram Fasteners Ltd. V. Flexitech, Inc.*, No. 08-CV-13103, 2009 WL 3763772, at *8 (E.D. Mich. Nov. 9, 2009)). But BW likely dropped the case now because it supports Modern. The case explains: "In the automotive industry and under Michigan law, a blanket purchase order does not oblige [the seller] to manufacture or ship any parts. That obligation arises when [the buyer] issues . . . a release order that would issue against the blanket purchase order." *Sundram*, 2009 WL 3763772 at *8.

[11] A label of "requirements" contract is not dispositive. Substance prevails over form. "The court is not bound by what the contract is called, it must look to the terms in deciding what it is."

Contracts lack an obligation by BW to purchase *any* amount from Modern, and thus fail for lack of consideration. The relevant provisions state: "…*subject to Buyer's termination rights*, this [PO] is a requirement contract under which Buyer will purchase … all … of the goods or services *specified* for the length of the applicable manufacture's program production life . . . *as determined by the [OEM]*."  Dkt. 1-2, p.2 (emphasis added). Three portions show this lack of consideration.

First, BW is obligated to purchase only goods "specified[,]" and the Supply Contracts contain no specific quantities,. Thus "specified" means BW is only bound by quantities in later-sent releases, not binding BW to any actual quantity of its requirements from Modern. In an oft-cited case, the Sixth Circuit held that similar language did not establish a requirements contract: "Seller agrees to furnish Buyer's requirements for the goods…covered by this Purchase Order *to the extent of and in accordance with ... Buyer's written instructions*." *Advanced Plastics Corp. v. White Consolidated Industries, Inc.*, 47 F.3d 1167, at *2 (6th Cir. 1995). The Supply Contracts are thus more akin to "release-by-release" contracts instead of a requirements contract, because they "do[] not set forth the share of the buyer's need to be purchased from the supplier." *MSSC, Inc. v. Airboss Flexible Prod. Co.*, 999 N.W.2d 335, 339-40 (Mich. 2023), *as amended* (Sept. 22, 2023).

Second, the specific orders are "determined by the [OEM]." If the OEM

*Ralph Const., Inc. v. United States*, 4 Cl. Ct. 727, 731 (1984); *see also Propane Indus., Inc. v. Gen. Motors Corp.*, 429 F.Supp. 214, 219-20 (W.D.Mo.1977).

never made any orders, then BW would never need any parts, and thus would never have any requirements for parts. Under that circumstance, BW could *never order any parts* from Modern. *See MSSC*, 999 N.W.2d at 343; *Brisbin*, 398 F.3d at 293; *IWTMM, Inc. v. Forest Hills Rest Home*, 577 S.E.2d 175 (App. N.C. 2003).

Third, the Supply Contracts are "subject to "[BW's] termination rights." The power to terminate is restated in stronger terms: "In addition to any other rights of Buyer to cancel or terminate this Purchase Order, Buyer may terminate all or any part of this Purchase Order *at any time and for any reason* by giving written notice to Seller." Dkt. 1-2, p.5. With the power to terminate *at any time*, BW could terminate the contract *before ever placing an order* and thus bear no obligation to purchase.  As such, numerous courts have held that that writing does not form a requirements contract. *See MSSC*, 999 N.W.2d at 340–43.

Fourth, the Supply Contracts are not exclusive, which impacts "whether a requirement contract exists." *Eberspaecher*, 2012 WL 4356781 at *6-7.

Finally, the Court cannot address this question by looking merely at the text of the Supply Contracts. Courts have repeatedly held that evidence beyond the contract documents (e.g., course of dealing, etc.) is appropriate in determining the meaning and impact of this language. *See MSSC,* 999 N.W.2d at 346; *Eberspaecher*, 2012 WL 4356781 at *6-7; *see generally* RM Decl.

**4. Even if BW's "Supply Contracts" create a binding requirements contract, BW cannot show any breach.**

17

### a. *BW provides insufficient details to demonstrate a breach.*

As explained above, BW has not provided sufficient detail to demonstrate that Modern breached any specific orders or Spot Buy POs. *See supra* Section B.1.

### b. *Modern's price increases comply with the "Supply Contracts."*

BW cannot establish breach for another reason—Modern's price increases are permitted by the "Supply Contracts" even assuming they are binding. BW's Terms expressly permit an increase of prices due to "increased costs incurred by Seller in connect with any raw materials or subcontractors" if such increased costs" have been negotiated and agreed to in advance and in writing by Buyer." Dkt. 1-2, p. 2. That precise scenario occurred here. Grede—BW's required supplier for castings—increased its prices for castings, necessitating price increases from Modern. *Id.* BW "negotiated and agreed to" those price increases pursuant to the contracts between BW and Grede.  RM Decl. ¶¶ 15, 36, 50-54. As a result, Modern's price increases complied with BW's alleged "Supply Contracts" and no breach occurred.

### c. *BW's substantial material breaches excuse Modern's performance*

BW's breach claim fails for a final reason—BW breached its contractual relationship with Modern, and "[h]e who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform." *Ehlinger v. Bodi Lake Lunber Co.*, 36 N.W.2d 311, 316 (Mich. 1949). Two breaches are relevant. First, BW's breaches are the subject of the pending WDPA Action. Dkt. 20 (Complaint). Second, assuming a requirements contract

existed, BW had a duty to purchase its "requirements as may occur in good faith," *see* 13 Pa. C.S. § 2306, and BW violated that duty by failing to order five of the Parts at issue for years, including one not ordered *for seven years*. RM Decl. ¶ 69.

> **5. The fact-intensive, open choice of law question also makes a mandatory preliminary injunction inappropriate.**

As a diversity case, North Carolina's choice of law rules apply. North Carolina's multi-step approach to choice of law for contracts requires that analysis for each contract. *See Boudreau v. Baughman*, 322 N.C. 331, 335 (N.C. 1988). With nine separate Parts at issue here, with scores of underlying releases for each, a choice of law analysis is needed for each one. While BW contends that Michigan law applies, relying on its POs' Terms & Conditions, Compl. ¶ 21, that clause never became operational because Modern never accepted BW's Terms & Conditions.

Without an effective choice of law clause, "for disputes involving contract, the default choice of law rule in North Carolina is *lex loci contractus*, under which the court applies the substantive law of the place where the contract is made." *Certain Interested Underwriters Subscribing to Pol'y No. B1262P20017013 v. Am. Realty Advisors*, 2017 WL 5195864, at *5 (E.D.N.C. Nov. 9, 2017) (citing *Boudreau*, 322 N.C. at 335). To localize the formation of the contracts at issue, the "situs" of a contract claim is "the state where the last act to make a binding contract occurred." *Id.* Thus, not only does the timing of either BW's or Modern's ac-

19

ceptance of each contract become relevant, but so too does the location of the ac-ceptance.  That requires a detailed record that BW has not produced here.

**C.    BW's alleged harm is not irreparable**

BW fails to establish irreparable harm. "To establish irreparable harm, the movant must make a clear showing that it will suffer harm that is neither remote nor speculative, but actual and imminent," and that the harm "cannot be fully recti-fied by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019). If money damages will remedy the harm, it is not irreparable. *Id.* at 218.

**1.  Any BW harm is "remote and speculative," not "actual imminent."**

The Complaint puts nine different Parts at issue; yet for seven parts,[12] BW makes no attempt to show harm, let alone "actual or imminent" harm. BW admits it has sufficient inventory of these parts and then only speculates that "the OEMs may issue additional orders[.] (Dkt. 9-2 (Maynard Decl.), ¶ 22.). That hedging is categorically not "actual" or "imminent." *See FS Med. Supplies, LLC v. Tanner Pharma UK Ltd.*, 2023 WL 6812565, at *3 (W.D.N.C. Oct. 16, 2023).

For the other two parts, BW likewise has not met its burden. First, BW's al-leged harm is purely speculative, not "actual." It wholly relies on unsupported events that "could" happen: Customer shutdowns "could" occur, workers "could"

---

[12] Part Nos. 156268, 170082, 173513, 174272, 192518, and 169228.

be laid off, customers "could" face monetary losses, and BWs' goodwill and reputation "could" be damaged. Absent is *any* actual evidence of this speculative harm aside from a "self-serving affidavit." *See Nat'l Enterprises, Inc. v. Barnes*, 201 F.3d 331, 335 (4th Cir. 2000). This alone merits denial of BW's motion.

Second, any alleged harm is not "imminent." For Part 175797, BW itself "estimates" it will not run out until *December* 2024. *See* Dkt. 9 (Pl. Mem. of Law), p. 11. And all Parts, BW has known for a year and a half, if not longer, that Modern would not accept releases and ship these parts because the releases do not comply with Modern's Quotations. *See supra* p.7. In the meantime, BW appears to have done nothing meaningful to resolve the situation and avoid the alleged disaster it now claims to face, failing to comply with its "duty to mitigate damages." *Justus v. Rosner*, 821 S.E.2d 765, 771 (N.C. 2018). The past year and a half was plenty of time to attempt to find an alternative supplier, negotiate a permanent resolution with Modern, or seek the declaratory judgment though the Courts BW now seeks. Indeed, BW easily could have raised these issues as counterclaims in the WDPA Action, but instead chose to wait until now, at the last minute, in a different Court, when it knows even an injunction now will not result in parts for several months. And even in this action, after filing its complaint, BW waited **12 days** to file its motion for preliminary injunction, all while arguing with a straight face that it needed a hearing and order prior to August 12th.

BW's delay alone supports denial of its motion. "Since an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required." *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989). Such "failure to act with haste"—of "even only a few months" — "belies claims of emergency." *FS Med. Supplies*, 2023 WL 6812565 at *4. Courts addressing similar delayed "emergencies" have rejected claims for "immediate" injunctive relief. *See, e.g.*, *id.* (six-month delay); *Southtech Orthopedics, Inc. v. Dingus*, 428 F. Supp. 2d 410, 420 (E.D.N.C. 2006) (six to nine week delay); *Monowise Ltd. Corp. v. Ozy Media, Inc.*, 2018 WL 2089342, at *2 (S.D.N.Y. May 3, 2018) (collecting cases). So too does BW's delay belie any "emergency."

## 2.  Money Damages Can Make BW Whole

This a breach of contract claim and a classic case where money damages could compensate any proven harm. As the Fourth Circuit has explained,

> [W]hen anticipated economic losses will be recoverable at the end of litigation, then those losses generally will not qualify as irreparable ...By definition, a temporary loss is not irreparable. Only when a temporary delay in recovery somehow translates to permanent injury – threatening a party's very existence by, for instance, driving it out of business before litigation concludes – could it qualify as irreparable. But otherwise, financial losses that can be recovered by … at the close of litigation ordinarily will not justify preliminary relief.

*Mountain Valley Pipeline*, 915 F.3d at 218. But BW has not alleged the shutdown of its business or anything of the sort. And to the extent BW's speculative loss of

22

customers or goodwill comes to pass, that can readily be remedied with money damages based on data that BW undoubtedly has available to it. Those are not irreparable harms. *See, e.g.*, *Southtech*, 428 F. Supp. 2d at 418 (rejecting "argu[ment] that it will be irreparably harmed by the loss of valuable customer relationships and customer goodwill,"); *Martin v. Bimbo Foods Bakeries Distribution, Inc.*, 2014 WL 2439954, at *6-7 (E.D.N.C. May 30, 2014) (collecting cases) (alleged harms to "reputation and goodwill" are not irreparable when there is "sufficient historical data from which to calculate monetary damages."). At its core, this is a price dispute between the parties. That dispute over money is not irreparable.

## D.      The Balance of the Harms Favors Modern

Imposing an injunction to supply any of the Parts to BW will significantly burden Modern, not BW. Modern is not currently producing any of the Parts at issue, so restarting production would require a heavy undertaking. As explained above, such an undertaking would impose substantial costs and untold harm on Modern and its reputation and goodwill. *See supra* p. 7-9; RM Decl. ¶¶ 74-83.

## E.      The Public Interest Favors Modern Too

Likewise, the harm from an injunction would extend beyond Modern up and down the supply chain to its customers too, including the U.S. military and the public generally. *See supra* p. 7-9; RM Decl. ¶¶ 74-83. Furthermore, this dispute will interfere with the public interest in efficient judicial administration. A court

may reject an injunction that would "impose administrative burdens on the judicial system." *Ass'n of Cmty. Organizations for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 797 (7th Cir. 1995) (Posner, J.). Ordering BW's injunction will require Court supervision of the parties' relationship in perpetuity. "Difficulty of enforcement is, in itself, often a sufficient reason for denying injunctive relief. The Court should not be called upon to weld together two business entities which have shown a propensity for disagreement, friction, and even adverse litigation." *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 134 n.3 (5th Cir. 1979).

## F.    BW's Proposed Order Is Overbroad and Would Address Matters Not in Dispute Before This Court

"Whenever the extraordinary writ of injunction is granted, it should be tailored to restrain no more than what is reasonably required to accomplish its ends. Particularly is this so when preliminary relief, on something less than a full record and full resolution of the facts, is granted." *Consolidation Coal Co. v. Disabled Miners of S. W. Va.*, 442 F.2d 1261, 1267 (4th Cir. 1971) (vacating injunction). Modern objects to both the proposed order's "findings" and the overbroad scope of relief. *See* Dkt. 9-1 (Pl. Proposed Order), ¶¶ 1–6, A–C. Namely, BW seeks an indefinite order that Modern "resume manufacture and delivery of all Parts at the times and in the quantities ordered by [BW]." *Id.*, ¶ B Furthermore, BW seeks relief far broader than the dispute at issue here by seeking an order that Modern cannot "tak[e] any action inconsistent with Modern's obligations to BW in accordance

24

with the terms as provided in the parties' Supply Contracts." *Id.*, ¶ C. But the Complaint only puts some terms at issue—not all of them. This "order [is] too broad" for the dispute and evidence and should be rejected. *Id.* at 1267.

## G.      A Substantial Financial Bond Is Required In the Event of an Injunction

A preliminary injunction requires "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). The rule is unambiguous, and the "[f]ailure to require a bond before granting preliminary injunctive relief is reversible error." *Dist. 17, United Mine Workers v. A & M Trucking, Inc.*, 991 F.2d 108, 110 (4th Cir. 1993). Modern needs a substantial bond to protect its interests. First, if the Court orders Modern to supply a Part, then the difference in price between BW's POs and Modern's prices on its quotations must be included in the bond. *See Eberspaecher*, 2012 WL 1247174 at *7. Second, supplying any part would impose massive costs on Modern, as explained above and in Marcoline's Declaration. These burdens all multiple ninefold if the Court orders a mandatory injunction for all nine Parts. Here, equity necessitates a large financial bond.

## CONCLUSION

Because BorgWarner has not met its high burden for the "extraordinary" relief it seeks, Modern Industries, Inc. respectfully requests that this Court DENY BorgWarner's Motion for Preliminary Injunction.

Respectfully submitted,


/s/ Alexander K. Cox
Alexander K. Cox, Esq., admitted *Pro Hac Vice*
PA Bar No. 32265
KNOX McLAUGHLIN GORNALL
& SENNETT, P.C
120 West 10th Street
Erie, PA  16501-1461
Tel:  (814) 459-2800
Fax:  (814) 453-4530
Email: acox@kmgslaw.com

Hayley R. Wells
N.C. State Bar I.D. No.:  38465
Email:  docket@wardandsmith.com*
Email:  hrw@wardandsmith.com**
Clinton H. Cogburn
N.C. State Bar I.D. No.:  50628
Email:  chcogburn@wardandsmith.com**

For the firm of
Ward and Smith, P.A.
Post Office Box 2020
Asheville, NC  28802-2020
Telephone:  828.348.6070
Facsimile:  828.348.6077


Attorneys for Defendant,
Modern Industries, Inc.

# 2524005.v2

## ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order entered on June 18, 2024, in the United States District Court for the Western Division of North Carolina, docket number 3:24-mc-104, I hereby certify that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources.

I further certify that every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at my direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

/s/ Alexander K. Cox
Alexander K. Cox, Esq., admitted *Pro Hac Vice*
PA Bar No. 32265
KNOX McLAUGHLIN GORNALL
& SENNETT, P.C
120 West 10th Street
Erie, PA  16501-1461
Tel:  (814) 459-2800
Fax:  (814) 453-4530
Email: acox@kmgslaw.com