# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| BORGWARNER TURBO SYSTEMS, LLC, a Delaware LLC, Plaintiff | ) ) ) ) | Docket No. 1:24-cv-00188-MR-WCM |
| v. | ) ) | **DECLARATION OF ROBERT MARCOLINE** |
| MODERN INDUSTRIES, INC., a Pennsylvania corporation Defendant | ) ) ) | |

I, Robert Marcoline, state that I have personal knowledge of the facts contained in this Declaration and if called to testify would state:

1.    I am employed at Modern Industries Inc. and am the Division Manager for Modern's Machining Division.

2.    In my capacity as Machining Division Manager, I am responsible for managing the production of machined customer designed parts, and complimentary operations for our customers.

3.    More specifically as to BorgWarner, I have supported commercial negotiations, orders, and related items as it pertains to Modern and BorgWarner, and in particular the parts identified in BorgWarner's Complaint.

4.    Modern is a second generation family owned business established in 1946 by a returning WWII veteran who was driven to build a company that would have a positive impact on all those involved with his endeavor.

1

5.      Modern provides high quality manufacturing, process and testing services across its various divisions—machining, heat treating, products, and laboratory testing.

6.      Modern serves a diverse market of customers.  Its markets include United States defense, military, and aerospace customers; medical devices and equipment providers; water and wastewater industries (including municipalities); and automotive suppliers, among others.

7.      BorgWarner and its affiliates have purchased a variety of parts— namely turbocharger components and related items—from Modern for over two decades.

8.      During that lengthy supply relationship, BorgWarner has purchased in excess of forty (40) different parts from Modern.

9.      All purchases from Modern—including those by BorgWarner—are subject to Modern's Standard Conditions of Sale ("Standard Conditions").

10.      For every contractual relationship requesting purchase of a machined part or service from a customer or prospect—including those by BorgWarner— Modern typically sends a Quotation or may provide a Summary Price List.  The Quotation indicates Modern's price for the part, any minimum order quantities ("MOQ"), and other key terms.  The Quotation says that Modern "submit[s] the

following quotation for your consideration," that "[t]his quotation is subject to standard conditions of sale" provided with the Quotation.

11.    Modern's standard practice is to attach its Standard Conditions of Sale ("Standard Conditions") to each Quotation provided by Modern to its customer.  A true and correct copy of Modern's Standard Conditions of Sale is attached hereto as Exhibit B.

12.    Modern's Standard Conditions contain the following provisions, among others:

- ACCEPTANCE – All orders are subject to acceptance by Modern Industries, Inc.

- BLANKET ORDERS – Blanket orders must contain firm releases for total quantity involved on order.  Blanket orders may be effective for a maximum of one year . . .

- QUANTITY FACTOR – It is difficult to predict accurately the quantity of parts that will be lost in processing.  Prices are based on the option to ship over or under by ten percent of the quantity ordered unless otherwise stated.

- MATERIAL AND PROCESSING PRICES – Quoted prices are based on current material and other processing purchase costs.  Quote may be changed to reflect changes in our purchase costs at time of order acceptance.

13.    Modern and BorgWarner do not have one overarching, negotiated, counter-signed, written supply agreement that governs any single part, much less an agreement that governs all parts provided by Modern.

3

14.     Instead, the commercial history for every part purchased from Modern by BorgWarner—including the nine parts at issue here (the "Parts")—is complex and fact intensive.

15.     As a general matter, for each part, Modern and BorgWarner's typical practice would include the following steps:

- BorgWarner expresses interest in purchasing specific parts from Modern, either through direct inquiry or by issuing a purchase order for a given part (which purports to incorporate BorgWarner's standard terms and conditions). The purchase order—like those at issue here—does not identify a quantity and often has an end date of "12/31/9999"). BorgWarner does not separately send Modern copies of its purported terms and conditions.

- Modern provides its quotation which indicates Modern's price for the part, any minimum order quantities ("MOQ"), and other key terms. Modern's "quotation is subject to" its own "Standard Conditions of Sale" which are sent along with the quotation. This quotation sometimes is provided before BorgWarner provides a purchase order. Alternatively Modern has used—and BorgWarner has accepted—the practice of publishing Summary Price Lists with multiple historic part numbers.

- Modern does not accept or acknowledge BorgWarner's purchase order or terms and conditions in writing.

- BorgWarner issues forecasts through its electronic data interchange ("EDI") system, followed by releases. These releases constitute the actual requested demand schedule for parts and include the quantity, cumulative quantities received, and current requested quantities for both fixed and forecasted demand.

- The price for parts covered by the releases is previously exchanged between the parties through purchase orders, Quotations, Summary Price Lists, or individual email communications.

- Modern reviews the changes and requests-within each new release, and determines the commercial feasibility for proceeding to provide the quantities and items requested, and commence to purchase materials and manufacture, and ship the parts.

- If Modern disagrees with the release or other terms (e.g., quantity and/or price does not match Modern's previously quoted prices or MOQs, or if a commercial pricing and/or delivery update is deemed to be warranted by Modern at the time of the requested release), Modern may notify BorgWarner, in which case BorgWarner may update its price and quantity, as needed.  The specific circumstances vary with each part and each release.

- Once Modern and BorgWarner are aligned on the terms—price, quantity, etc.—for a given release, Modern will proceed to process the order based on its standard practices of order acceptance, and Modern ships the ordered quantity.

- If Modern and BorgWarner are not aligned on the terms for given releases, Modern will not accept or ship against the releases, which is communicated to BorgWarner.

- On occasion, the BorgWarner designated casting supplier—typically Grede, LLC (or one its affiliates)—will ship less or more than Modern ordered, within a small margin, which may cause Modern to ship to BorgWarner less or more than what BorgWarner requested.  The parties' course of dealing in these circumstances is for BorgWarner to accept the quantity shipped in full satisfaction of the order. This is standard practice in the metals casting/foundry industry and has been common practice by BorgWarner.

5

16. The details of this supply history for any given part is reflected in scores of documents: quotations, terms and conditions, releases, purchase orders, forecasts, acceptances of releases, shipping directives, invoices, and email communications, among others.

17. For the Parts, Modern and BorgWarner followed their standard practice set forth above.

18. BorgWarner's contention that its purchase orders and terms and conditions constitute the full, binding agreement between the parties is not the case and is inconsistent with the commercial history and course of dealing between the parties.

19. BorgWarner would not always issue its purchase order before Modern would accept releases and ship ordered quantities.

20. Modern never agreed to or accepted in writing (or otherwise) BorgWarner's blanket purchase orders or terms and conditions for the Parts.

21. Indeed, Modern issued its quotations, with its Standard Conditions, periodically to BorgWarner, including before receipt of any purchase order from BorgWarner.

22. In response to Modern's quotations for the Parts, BorgWarner would issue releases, matching some or all of the quantity, price, and shipping terms on Modern's quotations.

23.    For the Parts—as with many of the parts BorgWarner purchased from Modern—the prices regularly changed, without a formal written agreement. Instead, the price changes occurred after Modern issued an updated quotation and BorgWarner issued purchase order revision or other update to price (e.g., through email communications), consistent with standard industry practice and the parties' course of dealing.

24.    Modern's practice for these Parts has consistently been to not accept purchase orders or substantive scheduling changes with prices or quantities that did not match its quotations.

25.    Likewise, Modern's practice for these Parts has consistently been to not ship against or otherwise take action on BorgWarner releases without alignment on prices and quantities.

26.    And BorgWarner's practice, until 2023, was to update its releases with Modern's quoted prices and recognizing that parts would not be shipped until releases were updated and accepted by Modern.

27.    For the primary part at issue here—Part 175817—BorgWarner's own purchase orders attached to the complaint show five different price changes, essentially on an annual (or near-annual) basis.

28.    Modern's records for Part 175817 show even more: fifteen different prices for this Part, beginning December 17, 2008 until February 20, 2023.

29.    The commercial history for Part 175817 further reflects the true—and complex—nature of the commercial dealings between the parties for the Parts.

30.    For Part 175817, Modern regularly provided BorgWarner with quotations, indicating its prices, MOQ, and its Standard Conditions to which all orders were subject, dating as far back as December 17, 2008.  Modern issued additional quotations with its standard conditions on at least three additional occasions:  April 2017, April 2021, and February 2023.  Attached as Exhibit C are true and correct copies of Modern's quotations for Part 175817 issued to BorgWarner on the date identified.

31.    BorgWarner claims to have at some point issued a blanket shipping order for Part 175817 that is labeled a "scheduling agreement" and that BorgWarner refers to as the governing "Purchase Order" (the "175817 Blanket Purchase Order").

32.    The 175817 Blanket Purchase Order and its ostensibly referenced terms and conditions conflict with the parties' course of dealing and Modern's Standard Conditions in key respects.

33.    Critically, consistent with the parties course of dealing and Modern's Standard Terms, (a) any orders "are subject to acceptance by Modern Industries, Inc." and (b) any "blanket orders" must contain "firm releases" and may "effective for a maximum of one year."

34.    Like all BorgWarner blanket purchase orders, Modern never accepted the 175817 Blanket Purchase Order or otherwise indicated it was deviating from its previous terms and the parties' course of dealing.

35.    Thereafter, BorgWarner began issuing individual releases at Modern's most recently quoted price and consistent with the parties' past practices and course of dealing and Modern's Standard Conditions—e.g., the releases were "firm releases," with a quantity, and effective for less than a year.

36.    Because the releases matched Modern's quotations—e.g., in price and MOQ—and complied with Modern's Standard Conditions, Modern determined that it was able to manufacture and shipped the ordered goods.

37.    In February 2023, Modern again issued an updated Quotation, in part due to increases in casting costs from Grede (BorgWarner's designated supplier). *See* Exhibit C.

38.    Like all prior Quotations, it included price, MOQ, and Modern's Standard Conditions.

39.    BorgWarner thereafter began issuing individual releases; however, the releases did not comply with the Modern Quotation and the parties' course of dealing, as the releases were for outdated prices.

40.    As a result—and as Modern explained to BorgWarner—Modern declined to proceed with the requested releases until they were updated.

41.    Modern has maintained and repeated that position since February 2023.

42.    The commercial history for the remaining Parts is substantially similar, with Modern regularly providing quotations and accepting only releases that complied with those quotations and Modern's Standard Conditions.

43.    Attached as Exhibit D are true and correct copies of Modern's quotations for Part 156268 issued to BorgWarner on the date identified.

44.    Attached as Exhibit E are true and correct copies of Modern's quotations for Part 170082 issued to BorgWarner on the date identified.

45.    Attached as Exhibits F are true and correct copies of Modern's quotations for Part 173513 issued to BorgWarner on the date identified.

46.    Attached as Exhibits G are true and correct copies of Modern's quotations for Part 174272 issued to BorgWarner on the date identified.

47.    Attached as Exhibits H are true and correct copies of Modern's quotations for Part 175797 issued to BorgWarner on the date identified.

48.    Attached as Exhibits I are true and correct copies of Modern's quotations for Part 192518 issued to BorgWarner on the date identified.

49.    Attached as Exhibits J are true and correct copies of Modern's quotations for Part 175815 issued to BorgWarner on the date identified.

50.    Attached as Exhibit K are true and correct copies of Modern's quotations for Part 169228 issued to BorgWarner on the date identified.

51.    Modern's price changes for these Parts are largely the result of increases in prices from BorgWarner's required supplier, Grede, which provides the core component of the Parts—castings.

52.     BorgWarner requires that all castings for these Parts be supplied by Grede, at Grede's terms.

53.    Grede—along with nearly every business over the last several years— has increased its prices for castings for these parts frequently over the last several years.

54.    BorgWarner is aware of these price increases from Grede and in repeatedly purchased parts from Modern at increased prices as a result, as discussed above.

55.    As Modern understands it, BorgWarner directly negotiates and agrees to these casting prices increases with Grede.

56.    The disagreement between the parties for the Parts is not new and, in fact has been ongoing for well over a year.

57.    As explained above, for Part 175817—the main part at issue in this litigation—BorgWarner has known Modern's position since February 20, 2023, when Modern issued its most recent quotation with its Standard Conditions.

11

58.     Thereafter—since February 20, 2023—Modern has not accepted any releases inconsistent with this quotation.

59.     Modern did accept two individual "spot buy purchase orders," but those were at Modern's price and outside of the normal procedure for releases in any event.

60.     The parties continued discussion the quotation and its price increase (for this and other parts) for several months.  Attached as Exhibit L is a true and correct copy of an email reflecting these discussions.

61.     Meanwhile, Modern continued to not accept releases for these Parts that were inconsistent with its quotations.

62.     In March of 2024, Modern reiterated its position to BorgWarner and requested that BorgWarner adjust its releases to align with Modern's terms. Modern reiterated this position repeatedly over the following months.  Attached as Exhibit M are true and correct copies of emails from Modern to BorgWarner.

63.     Then, just a couple weeks before the parties were set to mediate the related case pending in the Western District of Pennsylvania, BorgWarner sent Modern a demand letter regarding these parts, followed by a proposed spot buy purchase order a few days before mediation.

64.     In response, Modern asked BorgWarner for the exact number of parts BorgWarner needed, and BorgWarner reported it needed 120.

65.     BorgWarner's need was within the inventory Modern had on hand, and thus it agreed to ship 176 pieces—this inventory Modern had on hand.

66.     As BorgWarner knows, it will take Modern several weeks, if not longer, to manufacture and ship the parts.  Modern must order castings from Grede, wait for those to come in (shipping dates are out of Moderns' control and set by Grede), and then manufacture and assemble the full part once all components arrive.

67.     The same is generally true for the remaining parts at issue.  Modern issued quotations with its current prices several months—if not years—ago, and has not accepted inconsistent releases since those dates:

| Part No. | Date of Last Modern Quotation |
|---|---|
| 156268 | June 14, 2022 |
| 170082 | August 8, 2022 |
| 173513 | February 20, 2023 |
| 174272 | September 21, 2022 |
| 175797 | February 20, 2023 |
| 192518 | July 11, 2022 |
| 175817 | February 20, 2023 |
| 169228 | July 11, 2022 |

68.     Despite these ongoing disagreements, BorgWarner appears to not have pursued an alternative supplier or otherwise sought resolution of these issues.

69.     For several of the parts at issue here, BorgWarner has not issued releases for the parts for several years before the releases that led to the spot buy

13

purchase orders in November 2023.  For example, other than the November spot buy purchase orders, Modern's records reflect: (a) Part 170082 - no shipments since May 2017, (b) Part 173513 - no shipments since October 2018; (c) Part 192518 - no shipments since February 2019; Part 174272 - no shipments since May 2019; and (d) Part 156268 - no shipments since March 2020.

70.    Against the background of the price discussions regarding these parts, Modern and BorgWarner were also discussing interrelated issues arising out of BorgWarner's intent to resource production away from Modern for its "K31 parts."

71.    In short, in January of 2023, the parties agreed in principle to an update price for those parts.  BorgWarner thereafter elected to change suppliers for the product to the BorgWarner Aftermarket Group.

72.    Instead of abiding by the agreed-upon price for these parts, BorgWarner manufactured a pretextual never-before-used "framework" agreement that it tried to impose on Modern.

73.    The issue is addressed in more detail in the companion case pending in the Western District of Pennsylvania, and forms the basis for Modern's contention that BorgWarner breached its duty of good faith and fair dealing with Modern.

74.    BorgWarner is not Modern's only customer; far from it.  Modern provides a variety of manufacturing related services (including machining, manufacturing, heat-treating, assembly, etc.) for a diverse market of customers.

75.    As explained above, Modern's current customers include United States military/defense contractors, aerospace and health care providers.

76.    Like any manufacturing business, Modern works hard to schedule its production lines to maximize production levels and ensure that all customers are served timely and consistent with their required shipping timelines.

77.    Modern's production equipment and it's skilled labor and management personnel—and specifically those assets that would be used to manufacture the parts at issue here—are currently optimized and engaged in the processing of other customer's purchase order and release agreements.

78.    More specifically, those production lines and necessary skilled labor and other personnel are currently being used, or scheduled to be used in the coming weeks and months, for existing customers, including military and defense industry customers.

79.    If Modern is forced to interrupt its current production lines and personnel in favor of BorgWarner, Modern likely will incur significant costs associated with such a changeover: not only retooling, set-up and other transitional costs, but also possible labor stoppages and layoffs.

15

80.    The harm would not be limited to Modern, but likely would result in irreparable harm up and down the supply chain for Modern's customers—most critically the defense industry supply chain.

81.    The supply chain for those parts could grind to a halt and Modern's defense industry customers, like Modern, could be forced to send workers home, reduce hours, or even institute lay-offs at impacted facilities.

82.    Modern would also suffer irreparable harm to its goodwill and reputation with these other customers, as well as in the defense industry (and others) in general, which it has spent years fostering.

83.    If Modern and its customers' production lines and necessary personnel are not available due to forced production of BorgWarner parts, they will not be able to produce critical defense industry parts that have been purchased for ultimate use by the United States government, causing even further ripple effects to the defense industry, United States military endeavors, and the public generally.

84.    In November 2023, BorgWarner initiated a prior suit and then issued "spot buy purchase orders" for the parts at issue at prices and quantities consistent with Modern's quotations.

85.    Modern had some of the requested parts already in inventory and component parts for many others.

16

86.     Modern was able to ship and produce those parts in the November 2023 spot buy purchase orders and so at that time did not face the irreparable harm it now faces associated with diverting production lines currently assigned to other customers and products.

87.     Modern thus accepted the November 2023 spot buy purchase orders, and only the spot buy purchase orders.

88.     The commercial history between Modern and BorgWarner regarding these Parts is lengthy, complex, and fact-intensive.  It is set forth in decades of emails, quotations, releases, forecasts, invoices, acceptances, purchase orders, and other documents.

89.     Modern's filings in this case provide a limited, one-sided snapshot of the commercial history.

90.     Many of the likely relevant documents—such as forecasts (and revisions to same), releases (and revisions to same), and acceptances, among other documents—are contained on BorgWarner's EDI system and thus not fully accessible by Modern.

17

## I DECLARE UNDER PENALTY OF PERJURY THAT THE

## FOREGOING IS TRUE AND CORRECT.

Robert Marcoline

Date: ___08/07/24___