IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BORGWARNER TURBO SYSTEMS, LLC, <br>         Plaintiff, <br><br> v. <br><br> MODERN INDUSTRIES, INC., <br>         Defendant. | Case No. 1:24-cv-221 <br><br> RE: Motion for preliminary injunction <br> ECF No. 9 |

**MEMORANDUM OPINION**

**With Findings of Fact and Conclusions of Law**

Susan Paradise Baxter, J.

      This contract action was originally filed in the United States District Court for the Western District of North Carolina, Asheville Division. *See* ECF No. 1. On July 24, 2024, Plaintiff BorgWarner Turbo Systems, LLC ("BorgWarner") filed a motion for preliminary injunction against Defendant Modern Industries, Inc. ("Modern"). ECF No. 8. Modern moved to transfer venue to this District on July 30, 2024, and BorgWarner opposed that motion. ECF Nos. 18, 22. On August 7, 2024, Modern filed a brief in opposition to BorgWarner's motion for injunctive relief. ECF No. 23. The Court granted Modern's motion to transfer venue on August 14, 2024, and transferred the case to this District. *See* ECF No. 27. BorgWarner's motion for a preliminary injunction, originally filed in the Western District of North Carolina, is now before this Court and is ripe for disposition. For the reasons that follow, the Court finds that BorgWarner is not substantially likely to succeed on the merits and has not demonstrated an irreparable harm. The motion will be denied.

1

## I. Background

The factual background and history of twenty years of business dealings between the parties is complex and in large part underdeveloped at this early stage of litigation. For purposes of the motion for injunctive relief, a brief summary suffices.

BorgWarner manufactures turbochargers and purchases supplies for turbine housing from Modern Industries. ECF No. 1. BorgWarner alleges that the Parties have established nine "long-term requirements contracts," with each agreement involving a specific numbered part. *Id.* at ¶ 6. These agreements are evidenced by purchase orders and BorgWarner's "Purchase Order Terms and Conditions" document which are attached to the Complaint as Exhibits 1 and 2. *Id.* As alleged in the complaint, the supply contracts are requirements contracts which require Modern to supply, and BorgWarner to purchase, all of BorgWarner's quantity requirements for the parts. ECF No. 1, ¶ 8. BorgWarner incorporates the parts produced by Modern into turbocharger assemblies, which it then sells to other companies. *Id.* at ¶¶ 6-7. BorgWarner brings this action alleging that Modern has breached these supply contracts, as well as subsequent "spot buy POs" which came into existence in November of 2023 after difficulties around pricing and delivery arose between the parties.[1] *See id., generally.* BorgWarner also seeks a declaratory judgment. *Id.* at ¶¶ 89-94. As remedy for the breach of contract claims, BorgWarner seeks specific performance, as well as direct, consequential, and incidental monetary damages. *Id.* at page 14.

In moving for a preliminary injunction, BorgWarner asks that the Court order Modern to expedite the manufacture and delivery of Part No. 175817 in the quantities ordered by BorgWarner and also that Modern be ordered to resume the manufacture and delivery of all parts

---

[1] At Count I, BorgWarner alleges breach of the supply contracts relative to the nine individual parts. At Count II, the spot buy POs relate to twelve parts, nine of which are the same parts that form the basis of Count I. *See* ECF No. 1-3, pages 1-14.

at the times and in the quantities ordered by BorgWarner. *See* ECF No. 9-1, p. 2 (proposed order). BorgWarner argues that without such preliminary relief, it will be irreparably harmed. Before turning to a discussion of the merits of BorgWarner's motion, it is necessary to set out the standards governing the Court's decision.

## II.    Standards of Decision

The Court of Appeals for the Third Circuit recently reiterated the standards to be used in resolving motions for preliminary injunction: "[a] court weighing a preliminary injunction must consider four guideposts: (1) the movants' likelihood of success on the merits; (2) the risk that the movants will suffer irreparable harm absent preliminary relief; (3) the balance of equities; and (4) the public interest." *Boynes v. Limetree Bay Ventures LLC*, 110 F.4th 604, 610 (3d Cir. 2024). Of these factors, the first two factors are the "most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). If the first two are present, only then should a court consider the remaining factors. *Id.* at 435.

When deciding a request for injunctive relief, a district court assumes the dual role of both fact-finder and legal adjudicator. *Doe v. Pine-Richland Sch. Dist.*, 2024 WL 2058437, at *1 (W.D. Pa. May 7, 2024). Consequently, the court is required to make "findings of fact and conclusions of law upon the granting or refusing of a preliminary injunction." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1178 (3d Cir. 1990) *citing* Fed. R. Civ. P. 52(a)(2). This obligation imposed by Rule 52(a)(2) remains mandatory "even when there has been no evidentiary hearing on the motion." *Id.* However, at the preliminary injunction stage, "procedures are less formal and evidence is less complete than in a trial on the merits." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004). Additionally, the grant or denial

of a preliminary injunction is typically based on a limited set of facts, necessitating a delicate balancing act by the district judge. *AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994). Therefore, the court "may rely on affidavits and hearsay materials which would not be admissible evidence." *Kos Pharms.*, 369 F.3d at 718, *quoting Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). The significance attributed to such materials will "vary greatly depending on the facts and circumstances of a given case." *Id.* at 719. Additionally, the court is responsible for assessing the credibility of witness testimony and may base its decision to grant or deny a preliminary injunction on these credibility determinations. *See, e.g., Hudson Glob. Res. Holdings, Inc. v. Hill*, 2007 WL 1545678, at *8 (W.D. Pa. May 25, 2007).

"[A] preliminary injunction is an extraordinary and drastic remedy." *See Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.,* 108 F.4th 194, 202 (3d Cir. July 15, 2024) *quoting Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation marks and emphasis omitted). Issuing an injunction requires a court to exercise "great caution, deliberation, and sound discretion." *Id.* at 199-200 (citation omitted). "A court should not grant an injunction unless the plaintiff's right is clear, his impending injury is great, and only an injunction can avert that injury." *Id.*

It is BorgWarner, as the movant, who bears the burden of making "a clear showing" of its entitlement to such preliminary relief. *Id.* at 202. This extraordinary remedy is "never automatic: it always involves a district court's sound discretion." *Id.* at 194. Modern submits that BorgWarner's burden is made more difficult by the type of injunctive relief it seeks, contending that BorgWarner seeks a "mandatory injunction" as opposed to a "prohibitory" one. *See, e.g.*,

4

ECF No. 23, p. 10. The Court agrees with Modern's characterization of the request for preliminary injunctive relief.

*Mandatory or Prohibitory Injunction?*

An injunction is considered "mandatory" when it would "alter the status quo by commanding some positive act." *Pub. Interest Legal Foundation v. Boockvar*, 495 F. Supp.3d 354, 358 (M.D. Pa. 2020) (internal citation omitted). *See, e.g., Horton v. Rangos,* 2023 WL 8865872, at *7 (W.D. Pa. Dec. 22, 2023) *citing C.G. by & through P.G. v. Saucon Valley Sch. Dist.*, 571 F. Supp. 3d 430, 439 (E.D. Pa. 2021). A mandatory injunction is recognized as an extraordinary remedy, granted only sparingly by the courts. *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013) *citing Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972). Unlike a prohibitory injunction, which preserves the status quo, a party seeking a mandatory injunction faces a significantly higher burden in demonstrating its necessity. *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) (internal citations omitted). *See also Hart Intercivic, Inc. v. Diebold, Inc.*, 2009 WL 3245466, at *3 (D. Del. Sept. 30, 2009) (noting that when a plaintiff seeks a mandatory preliminary injunction rather than a prohibitory one, the burden of showing entitlement to relief is greater) *citing Sanofi-Aventis U.S. LLC v. Novo Nordisk*, Inc., 2006 WL 8457950, at *7 (D.N.J. June 22, 2006).

This distinction between mandatory and prohibitory injunctions is important because it affects the burden that the movant must meet. "For a prohibitory injunction, the moving party must show that his or her likelihood of success on the merits [is] significantly better than negligible but not necessarily more likely than not." *C.G. by & through P.G.*, 571 F.Supp. 3d at 439 (cleaned up). By contrast, for mandatory injunctions, a heightened standard applies. *See*

*Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020); *Bennington Foods LLC v. St. Croix Renaissance Group, LLP*, 528 F.3d 176, 179 (3d Cir. 2008).

To make the determination whether a request for preliminary injunctive relief is prohibitory or mandatory, we must identify the status quo and then examine it against the request for injunctive relief. Case law defines the status quo "as the last peaceable, non-contested status between the parties." *Satanic Temple, Inc. v. Saucon Valley Sch. Dist.*, 671 F.Supp.3d 555, 566 (E.D. Pa. 2023). Here, it is no surprise that the parties disagree as to what the status quo is: Modern contends the status quo is its own current status of production operations, while BorgWarner argues it is some unspecified time "before Modern stopped shipping Parts to extort price increases from BorgWarner." ECF No. 25, page 4. Given that the parties have a twenty-year history of business dealings between them, BorgWarner's argument, without reference to a specific point in time and without evidence in support thereof, is not sufficient to pinpoint a status quo ante.[2] BorgWarner has not identified the last non-contested status between the parties. Moreover, the parties do not pinpoint the date of the breakdown in their dealings relative to <u>each</u> individual part. So then, on this underdeveloped record, it is simply impossible for this Court to unearth "the last peaceable, non-contested status between the parties," especially given that there are nine separate agreements at issue here. There is evidence in the record that the commercial history of each of the parts is "complex and fact-intensive." ECF No. 23-1, ¶ 14. Accordingly, in

---

[2] On the contrary, Modern's argument, as supported by the attachments to the Verified Complaint, is the more convincing as it points out that the parties have not agreed on a price or the shipment of goods since February of 2023 as to at least <u>some</u> of the parts at issue here.

6

the absence of another identified point in time, the current status of production operations at Modern must serve as the status quo.³

In its request for preliminary injunctive relief, BorgWarner specifically requests that this Court order Modern (1) to "expedite manufacture and delivery" of Part 175817 and (2) to resume the manufacture and delivery of all other parts "at the times and in the quantities ordered by BorgWarner." ECF No. 9-1, p. 2, ¶ B. Based on the evidence as to the status quo between the parties, BorgWarner's request is of the mandatory variety. Modern is not currently producing the BorgWarner parts at issue in this case. There is credible and uncontradicted evidence before the Court that the production lines formerly utilized in manufacturing the BorgWarner parts "are currently optimized and engaged in the processing of other customer's purchase order and release agreements." ECF No. 23-1, ¶ 77. Modern's production lines and skilled labor are currently being used, or are scheduled to be used, for other customers. *Id.* at ¶ 78. Meanwhile, BorgWarner is asking the Court to direct Modern to immediately produce and deliver parts, which would necessitate halting production for other customers. *See Horton*, 2023 WL 8865872, at *7 ("A mandatory injunction alters the status quo by commanding some positive action or providing the moving party with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.") (cleaned up). Therefore, the injunctive relief BorgWarner seeks is a mandatory injunction as it aims to change the status quo by forcing Modern to interrupt its current production lines and schedule in favor of BorgWarner. With this in mind, the Court now turns to a discussion of the four factors to be used in analyzing BorgWarner's request for injunctive relief.

---

³ The parts at issue in this case are not the only parts that form the basis of the commercial history and ongoing business dealings between BorgWarner and Modern. *See, for example, Modern Industries, Inc. v. BorgWarner Turbo Systems, LLC*, C.A. No. 1:24-cv-83.

*The four-factor framework*

In analyzing a request for preliminary injunctive relief, the factors this Court must consider are:

      (1) The likelihood of success on the merits;

      (2) The risk of irreparable injury absent preliminary relief;

      (3) The balance of equities; and

      (4) The public interest.

*Delaware State Sportsmen's Assoc.*, 108 F.4th at 202 (referring to the factors as the "four canonical guideposts").

To determine the likelihood of success, a court must evaluate the merits of the legal claims. In order to demonstrate a likelihood of success in the context of a mandatory preliminary injunction, the movant "must show that his right to relief is not just probable but 'indisputably clear.'" *Garrett v. Am. Fed. of State, County & Muni. Employees AFL-CIO*, ___ F.Supp.3d ___, 2024 WL 1335186, at * 4 (E.D. Pa. Mar. 28, 2024) *quoting Hope*, 972 F.3d at 320. In any breach of contract claim[4], the plaintiff must first demonstrate the existence of a contract including its essential terms and then a breach of a duty imposed by the agreement. *ARFA Enterprises, Inc. v. Fioravanti*, 2014 WL 12599822, at *6 (E.D. Pa. Feb. 24, 2014) *citing Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004) (applying Pennsylvania law). *See also Vernon v. The Trustees of Gaston College*, 2024 WL 3898620, at *7 (N.C. Super. Ct. Aug. 21, 2024) *citing Poor v. Hill*, 138 N.C. App. 19, 26 (2000) (applying North Carolina law); *Bank of America*

---

[4] This Court sitting in a diversity action must apply state substantive law. *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000). Given the underdeveloped record here, it is unclear which state's law should be applied to the breach of contract claims. BorgWarner contends that Michigan law should apply, as set out in its Terms and Conditions, while Modern raises the possibility of a choice of law issue involving the state laws of Pennsylvania, Michigan, and North Carolina. The Court need not settle this question at this early juncture.

*v. Skyline Contractors, Inc.*, 2013 WL 12123663, at * 2 (E.D. Mi. Oct. 15, 2013) *quoting In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003) (applying Michigan law). State law requires that, like any contract, a requirements contract has certain legal elements, one of which is a meeting of the minds or mutual assent to contract. *City of Riviera Beach General Employees Retirement Sys. v. Mylan N.V.*, 2016 WL 4367549, at *6 (W.D. Pa. May 10, 2016) *citing Ribarchak v. Mun. Auth. of City of Monongahela*, 44 A.3d 706, 708 (Pa. Cmwlth. 2012) ("The elements of contract formation are offer, acceptance, and consideration or mutual meeting of the minds."); *Davis v. TMC Restaurant of Charlotte, LLC*, 854 Fed. App'x 518, 520 (4th Cir. May 7, 2021) *quoting Caissons, LLC v. Choate Constr. Co.*, 247 N.C.App. 104, 110 (2016) (in North Carolina, "[t]he well-settled elements of a valid contract are offer, acceptance, consideration, and mutuality of assent to the contract's essential terms."); *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 881 (6th Cir. 2021) *quoting AFT Mich. v. State*, 497 Mich. 197, 866 N.W.2d 782, 804 (2015) and *Huntington Nat'l Bank v. Daniel J. Aronoff Living Trust*, 305 Mich.App. 496, 853 N.W.2d 481, 488 (2014) ("Under Michigan law, [a] valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." […] [T]here must be mutual assent—i.e., a meeting of the minds on all the essential elements of the agreement."). As the party seeking mandatory injunctive relief, it is BorgWarner's burden to show the likelihood of success on the merits by demonstrating the existence of a contract.

"Irreparable harm" -- the other another gateway factor for preliminary injunctive relief -- is "potential harm that cannot be redressed by a legal or an equitable remedy following a trial." *Carty v. Wynnie Testamark*, 2024 WL 3835583, at *9 (D.C. V.I. Aug. 15, 2024) *quoting Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). BorgWarner, as the

9

movant, must demonstrate a "significant risk" that it will suffer "harm that cannot be adequately compensated after the fact by money damages." *Id. quoting Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000). "This is not an easy burden." *Id*. Besides a financial loss, BorgWarner contends that it will suffer the loss of customer goodwill, business relationships, and reputation. It explains that, in a just-in-time supply chain, the failure of a single supplier to fulfill its contractual obligations will inevitably cause a ripple effect throughout the entire chain. ECF No. 9, page 18. Furthermore, not only will the resulting financial impact on BorgWarner and its customers be "catastrophic," but BorgWarner will also suffer incalculable losses from being shut out of future supply work with its Original Equipment Manufacturers ("OEM"), John Deere and Caterpillar. And the break in the supply chain will cause irreparable damage to BorgWarner's reputation and it will likely lose future business opportunities. *Id*. It is well settled that the loss of customer goodwill, business relationships, and reputation can constitute irreparable harm for purposes of preliminary injunctive relief. *Kos Pharms.*, 369 F.3d at 726 ("grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will."). But because BorgWarner seeks a mandatory injunction, it must meet a heightened standard to establish irreparable injury. *See Bennington Foods LLC v. St. Croix Renaissance, Group, LLP*, 528 F.3d 1176, 1180 (3d Cir. 2008) ("Moreover, where the relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction.").

Finally, if the court is satisfied that both gateway factors have been established by the movant, it moves on to consider the two remaining factors – whether granting relief will result in even greater harm to the nonmoving party and whether the public interest favors such preliminary relief. The court will then exercise its discretion to determine whether the overall

balance justifies granting preliminary relief. *See Mallet and Co. Inc. v. Lacayo,* 16 F.4th 364, 380 (3d Cir. 2021) *quoting Reilly v. City of Harrisburg,* 858 F.3d 173, 179 (3d Cir. 2017).

### III.   Findings of Fact

The Court makes the following findings based on the evidentiary record before it. *See* Fed.R.Civ.P. 52. That record specifically includes: two declarations of Steve Maynard, Purchasing Manager of BorgWarner's Arden, North Carolina plant and the declaration of Robert Marcoline, Machining Division Manager of Modern Industries, as well as multiple Modern Quotations (with Standard Conditions of Sale) Modern's Master Pricelist, BorgWarner's Purchase Order Terms & Conditions, numerous purchase orders and multiple email threads.

1. BorgWarner supplies its commercial vehicle customers with fan and fan drives and turbochargers. ECF No. 9-2, Maynard Declaration, ¶ 3. Modern is a machining and manufacturing company. *Id.* at ¶ 4. BorgWarner, as buyer, and Modern, as seller, are parties to a series of "long-term requirements contracts" for the supply of multiple turbine housing parts. *Id.* at ¶ 5.
2. Modern manufactures the parts and delivers them to BorgWarner's manufacturing facility in Arden, North Carolina. *Id.* at ¶ 9. These parts are not fungible and Modern is the single source supplier for BorgWarner. *Id.* at ¶¶ 10-11.
3. In the present litigation, long-term requirements contracts for nine separate parts are at issue. *Id.* at ¶ 5. The spot buy POs relate to twelve parts. *See* ECF No. 1-3, pages 1-14. The parts at issue in this litigation do not form the entire basis of the commercial

dealings between BorgWarner and Modern. ECF No. 23-1, Marcoline Declaration, ¶ 8.

4. BorgWarner operates on a just-in-time supply chain management model which means that manufacturers up and down the supply chain do not hold any significant inventory of parts; instead, they order only the number of parts needed for immediate productions. As such, BorgWarner indicates that timely delivery of parts is critical. ECF No. 9-2, ¶¶ 16-17.

5. The commercial history of each of the individual parts is "complex and fact-intensive." ECF No. 23-1, ¶ 14. Furthermore, "the detail of this supply history for any given part is reflected in scores of documents: quotations, terms and conditions, releases, purchase orders, forecasts, acceptances of releases, shipping directives, invoices, and email communications." *Id.* at ¶ 16.

6. There is no single "overarching, negotiated, counter-signed, written supply agreement" between Modern and BorgWarner that governs any individual part or all parts provided by Modern. *Id.* at ¶ 13.

7. Each of the separate parts at issue has its own history of dealings. *Id.* For example, as to the supply contracts, BorgWarner's Maynard indicates that the "relevant contract documents" are attached to the complaint:

- Part No. 175815      BorgWarner PO dated 8/10/2021
- Part No. 174272      BorgWarner PO dated 7/9/2014
- Part No. 156268      BorgWarner PO dated 10/4/2019
- Part No. 170082      BorgWarner PO dated 6/4/2013
- Part No. 173513      BorgWarner PO dated 8/10/2021

      - Part No. 192518      BorgWarner PO dated 10/6/2014

      - Part No. 175817      BorgWarner PO dated 8/10/2021

      - Part No. 169228      BorgWarner PO dated 3/11/2022

      - Part No. 175797      BorgWarner PO dated 8/10/2021

ECF No. 25-1, ¶ 5; ECF No. 1-1, pages 2-15.

8. According to Modern's Marcoline, the course of dealings on any individual part generally begins with BorgWarner expressing an interest in purchasing specific parts from Modern. Sometimes this interest was expressed by the issuance of a purchase order which purports to incorporate BorgWarner's standard terms and conditions. Thereafter, Modern would provide its quotation which indicates that it "is subject to" Modern's own "Standard Conditions of Sale." ECF No. 23-1, ¶ 15.

9. From time to time, Modern would provide a quote before BorgWarner sent a purchase other. *Id.*

10. Modern does not accept or acknowledge BorgWarner's purchase order or terms and conditions in writing. *Id.*

11. BorgWarner issues forecasts through its electronic data interchange system, followed by releases. The price for parts covered by the releases is previously exchanged between the parties through purchase orders, quotations, summary price lists, or individual email communications. *Id.*

12. Next, Modern reviews the changes and requests within each new release, and determines the commercial feasibility of proceeding. If Modern disagrees with the release or any other terms, Modern may notify BorgWarner, in which case

BorgWarner may update its price and quantity, as needed. The specific circumstances vary with each part and each release. *Id.*

13. If Modern and BorgWarner are aligned on the terms for a given release, Modern will proceed to process the order based on its standard practices of order acceptance, and then Modern ships the ordered quantity. However, if Modern and BorgWarner are not aligned on the terms for given releases, Modern will not accept or ship against the release, and the nonacceptance is communicated to BorgWarner. *Id.*

14. BorgWarner's Maynard declares that Modern accepts the supply contracts through performance, thus performing the parties' agreement as to each individual part. ECF No. 9-2, ¶ 7; 25-1, ¶ 3. The Court will not rely on this statement as evidence as it is a legal conclusion.

15. BorgWarner cannot replace Modern as its supplier in order to avoid supply chain disruptions. ECF No. 9-2, ¶ 14.

16. BorgWarner's Maynard testifies that:

    - Failure to deliver parts on time can shut down the entire supply chain within a matter of days, first stopping the parts-related production at a supplier like BorgWarner, and then stopping production at the OEM's plants related to the products into which the turbochargers are incorporated. These stoppages impact suppliers up and down the supply chain; when suppliers near the top of the supply chain halt production, suppliers further down must as well.

    - On August 14, 2024, BorgWarner will run out of Part No. 175817 and its production lines that require that part will shut down in two days. John Deere's related production lines will shut down within five days of forecasted receipt from BorgWarner. If John Deere's production lines are down, John Deere will not be able to produce commercial tractors that have been purchased by farmers and are scheduled for delivery. As a result, farmers will not receive the equipment needed to harvest crops, causing even further ripple effect to the public generally.

14

- BorgWarner estimates that Part No. 175797 will run out on October 18, 2024, causing relevant lines at the OEM to shut down as well.
- Shutdowns at BorgWarner and the OEMs will result in irreparable harm to BorgWarner and up and down the supply chain.

ECF No. 9-2, ¶¶ 17, 20-21, 23. These statements are of limited reliability due to the age of the declaration which was filed in late July in the Western District of North Carolina. Since the case was transferred to this district, BorgWarner has not provided any updated evidence in support of its motion.

17. BorgWarner's Maynard explains that the break in supply could damage its "substantial goodwill and business reputation causing incalculable injury" as it "has spent years fostering its goodwill as a reliable and on-time supplier and supplier credentials." ECF No. 9-2 at ¶ 26. He further explains that BorgWarner could be "shut out of additional work from it some suppliers." *Id*. at ¶ 27.

## IV. Conclusions of Law

1. Preliminary injunctions are "extraordinary remed[ies] granted in limited circumstances." *Razor Technology, LLC v. Hendrickson*, 2018 WL 2063844, at *8 (E.D. Pa. May 3, 2018).

2. The customary four-factor preliminary injunction standard requires the moving party to first demonstrate a reasonable likelihood of success on the merits and that it would suffer irreparable harm absent the award of an injunction. *ADP, LLC v. Rafferty*, 923 F.3d 113, 119-120 (3d Cir. 2019). If the movant meets the threshold showing, the court then must balance those two "gateway factors" against the relative hardship an injunction would inflict on the other parties and the public interest. *Id*.

3. BorgWarner seeks a mandatory injunction, as discussed *supra*, and as such must meet a heightened standard in establishing both the gateway prongs of likelihood of success and irreparable injury. *Hope*, 972 F.3d at 320.

*Likelihood of Success on the Merits*

4. In order to meet its "particularly heavy burden" for a mandatory injunction, BorgWarner must show "a substantial likelihood of success on the merits and that its right to relief is indisputably clear." *Id.*

5. BorgWarner has failed to establish substantial likelihood of success on the merits on its breach of contract claims.

6. To prevail on a breach of contract claim, a plaintiff must first demonstrate that a contract exists. This requires proving certain essential elements, including mutual assent, or a meeting of the minds, as to the key terms of the agreement. *Glover v. Junior*, 306 A.2d 899, 911 (Pa. Super. 2023) (in Commonwealth of Pennsylvania, "whether written or oral, a contract requires three essential elements: (1) mutual assent; (2) consideration; and (3) sufficiently definite terms."). *See also Granite Contracting, LLC v. Carlton Group, Inc.*, 2021 WL 6015728, at *3 (N.C. App. 2021) (under North Carolina law, "it is essential to the formation of any contract that there be mutual assent of both parties to the terms of the agreement so as to establish a meeting of the minds.") (cleaned up); *Baker v. Beird*, 2019 WL 1211465, at * 3 (Mich. App. 2019) (in Michigan, "mutual assent or a meeting of the minds on all the essential terms is needed to find the existence of a contract.") (cleaned up).

7. BorgWarner must establish the existence of a contract for each part at issue in this litigation.

8. BorgWarner has not demonstrated that there was mutual assent or a meeting of the minds as to any of the individual parts. This is so, at least in part, because the evidence is underdeveloped as to the existence of a contract as to <u>each</u> of the individual parts. By focusing on the forest rather than the trees, BorgWarner fails to demonstrate that the existence of any individual contract.

9. In the absence of evidence proving a contract, BorgWarner's likelihood of success on the breach of contract claims is naught.

*Irreparable Injury*

10. BorgWarner has also failed to establish an irreparable injury.

11. When requesting a mandatory preliminary injunction, the movant must "meet a higher standard showing irreparable harm in the absence of an injunction." *Doe v. Delaware Valley Regional High Sch. Bd. of Educ.*, 2024 WL 706797, at * 4 (D. N.J. Feb. 21, 2024) *quoting Bennington Foods*, 528 F.3d at 179.

12. Irreparable injury is generally "potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight, Inc.*, 882 F.2d at 801. "Mere injury, even if serious or substantial, is not sufficient." *United States v. Commonwealth of Pennsylvania*, 533 F.2d 107, 110 (3d Cir. 1976).

13. The irreparable harm must be "actual and imminent, not merely speculative." *Boynes*, 110 F.4th at 610, *citing Acierno*, 40 F.3d at 655. *See also Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487-88 and n.13 (3d Cir. 2000).

17

14. The loss of customer goodwill, business relationships, and reputation can constitute irreparable harm for purposes of preliminary injunctive relief. *Kos Pharms.*, 369 F.3d at 726.

15. Here, BorgWarner claims in the Maynard Declaration that it will lose its customer goodwill and business reputation, that shutdowns will occur at John Deere, and dire consequences will rebound on farmers if the Court does not issue this mandatory injunction. Yet, it was offered a contract by Modern over a year ago for the parts it seeks, but at a price it would not accept. So, it could have avoided these alleged dire consequences if it had not refused the terms it was offered – an increased price with no contractual recourse for what it considered to be overpayment. This does not constitute irreparable harm. In essence, BorgWarner is seeking a mandatory injunction from this Court to institute contract terms it was unable to negotiate.

16. Importantly, BorgWarner has not shown how, even if the purported harms are established, they could not be remedied by monetary relief, particularly consequential damages.

17. On this limited and aged evidentiary record, BorgWarner has not met its burden to show either likelihood of success on the merits or irreparable injury. Accordingly, its motion for injunctive relief will be denied.

An appropriate Order follows.